Good morning, Your Honor, and may it please the Court. You know what they say, if all you have is a hammer then every problem looks like a nail. In Tosca, Congress legislated a screw hole and they expected EPA to go get a screwdriver, but instead EPA took the hammer and pounded the screw into the hole. If you've ever tried that, you know that the screw ends up damaged and is not working as it's intended. What do I mean by that? They tell us that they use the Integrated Risk Information System. That's a tool built decades ago to identify whether a chemical has any non-zero hazards and find the bleeding edge of whether it might. And then finding that methylene chloride does have some non-zero hazards in some situations, they issued a ban of this extremely useful chemical across most of the economy. Now, their science, their evaluation of science is flawed in some obvious ways that we're happy to talk about. They had no evidence justifying the draconian remedy, this particular draconian remedy of a ban, but the fundamental misunderstanding of Tosca under LUB is before you even get to all of those. They've told this court that they were looking for appreciable risk, but their task was to determine whether there is unreasonable risk. Counsel, it seems like appreciable risk is nowhere in the briefing until page 64 of the EPA's brief. When they refer to it, it seems to me almost like an analogy, and you sure run with it in your reply brief. What do we have before us other than that one reference to whatever that acronym document is? And EPA says what we did here, you know the wording better than I do, is similar to or supported by or whatever. But I don't get from that any indication, you tell me why we should, that that's what the fundamental support for the actual analysis is, that appreciable word and the IRS, IRI, whatever it is. So we looked at the risk evaluation from 2020 and the determination from 2022 and what the analysis was. We presented that in the opening brief and we said, look, if you look at what they did, they were looking for any non-zero risk. And then their response to that was two things. One is, we were looking for, and you're right, it shows up in their brief. Their response was first- For the first time. For the first time, correct. Right, I agree with you. That's not what the rulemaking record says. The rulemaking record has this analysis. But they do not, I think, dispute our presentation of what the actual analysis was. And their response is that we characterize that as looking for non-zero risk. And their response is, no, we were looking for any appreciable risk. So that's the first thing. And then with respect to the IRIS, that is their response. We complained about their method and their analysis and their approach, which we said was looking for non-zero risk. Their answer was, but we've been using this method for decades. Well, what they say is the methods EPA used to determine methylene chloride points of departure and further are consistent with well-established methods for establishing reference doses and concentration. So supported by other methodology is how I read that. Is it in the administrative record that they're applying this analysis? There are, I believe, I'm going to have to find the actual record citations because it's a very long document. But I believe there are references in the determination and the evaluation that talk about use of IRS. Yes, I'll find it. I don't want you to have to linger here too long. Keep going. Fair. But I think, though, that essentially their response reveals the problem. We complained that they were looking for non-zero risk and they said we're looking for appreciable risk, which to my mind is the same problem. I do want to touch briefly on the pages of argument that the EPA has withdrawn. So those issues are very much in front of the court. They've been fully briefed. This court and the Supreme Court have addressed issues even when the government confesses error. And we are harmed on an ongoing basis by how those bad interpretations are baked into the rule. So I want to be explicit on how that is. And you're specifically talking about the PPE. And the whole chemical. And the whole chemical, right. That's right. So in 2020, they made a determination that there were six uses that do not present unreasonable risk. And yet they have issued regulations regulating those activities. There is no sense in which an exposure limit on what you do in manufacturing a product could address whatever risk there might be with somebody using the product. The justification for these is solely those two interpretations. Well, so how does that figure into the risk evaluate? You're saying that notwithstanding it's withdrawn, right? Their entire basis for regulation still depends on those. Is that what you're saying? I'm saying for those six uses. For six uses? Correct, Your Honor. All right. It doesn't affect the rest of it? I think for the rest of it, there are all of these defects. But I'm not going to tell you that, for example, the whole chemical. In 2020, they made a determination of unreasonable risk, which we think was deeply flawed. But they made that for a number of uses before they had issued these bad interpretations. Sorry. Before they changed from six uses to one use. Exactly, yeah. All right. Yeah. I would certainly say there is also a sense in which the one use interpretation infects the entire thing. But I have to acknowledge that those other, I forget the exact number, 48, let's say. Those 48 uses from 2020, they had found an unreasonable risk before this change of heart. Right, okay. So what are you saying we should do with the whole chemical and the PPE issues? I think we are, I think the court should, first off, agree with our interpretation. And I can elaborate what exactly that is, but you should vacate the rule on that basis. And on the basis that we are correct about those interpretations and that what EPA had done in the rule making was defective. because it was relied on misunderstanding the law. But vacated as to six uses, or vacated entirely based solely on that? Good question. There is, they did express an intention for severability in the rule itself. I'd like to acknowledge that as well, so it seemed, so I do think that you would end up vacating just those six on this basis, and then for the rest of the rule. And in doing that, I think the court would need to say, we are vacating it because of this legal error. I think you would issue a decision that says, you are to make determinations for a given condition of use, not for the chemical as a whole. You are to make a reasonable assessment of PPE, right? You would issue a decision about those. And then for the remainder, we have the bulk of the problems that we've talked about. Well, you've got four minutes left, so how about the other 48 conditions of use? Okay, so these 48, what we've got is the fundamental problem that they have assessed for any non-zero risk, rather than unreasonable risk, that they were given a job and they didn't do that job. They have- Go ahead. No, sorry. Well, the other two big picture topics I was going to remind the court is, they have deeply misunderstood the science. They've rejected studies in humans, despite a- Well, I'm catching my breath, didn't mean to interrupt.  Despite the fact, for example, that one of the country's leading occupational hygiene doctors wrote to them to say, these studies do not show that there's a risk. The name starts with a B, Borac. Borac. Yes. So let me ask you a question. This has been, chemical has been regulated by OSHA for years. Yes. And what exposure levels did OSHA require? There are two. 25 ppm for long term exposure, 125 ppm for short term exposure. So notice that is 10 times, 20 times, no, 10 times higher than what EPA's done, roughly speaking. All right, and they required PPE, correct? Correct. Has anybody done any epidemiological research to, or statistical survey as to how many employees in any of these uses have been adversely affected by methylene chloride? I, aside from the ones that are in the record, if we talk of particularly, I believe there is a study showing number of, like that there have been a number of reported incidents. But that's not statistics, because it's number against which baseline. We don't know that, I'm not aware of any. Well, but the number is a few handfuls or dozens.  Over a period of regulation by OSHA that must be at least 40 years, correct? Correct. So why shouldn't EPA be required to determine unreasonable risk in light, at least, of reality? If I understand the court's question, well, let me make sure, if I could answer. I know the TSCA says you have to tick off all these bases. Yeah. And unreasonable risk has nothing to do with economics, I understand that. But, if you're saying we're placing our emphasis on rat studies, you're rejecting the human studies, and you're not even considering whether there has been actual adverse effects over a four decade long and many decades long period of common industrial use of these chemicals. I don't, how does that, I mean, does that not even require by the statute? I think they definitely, if I, if you don't mind my answering, they, they, I have one minute left. They do need to, they do need to look at that. And I want to remind the court of something that it said in the corrosion proof fittings case. Roughly speaking, 13 people die a year of swallowing toothpicks. The number of deaths standing alone does not tell you, it's a vast country. That there have been a given number of incidents is not enough to tell you, like, the scale of the risk. Let me ask you about one of the technical features, and you'll have a red light for us over, but keep going with, in answering. Seems to be a significant point of departure in the briefs. Concerns the relevance of uncertainty factors and how that applies, the multiples that result from that. It's how you get down to two parts per million or 16 parts per million. Are you challenging the scientific validity of using uncertainty factors, the actual application in this case, EPA defends it by saying this is how it's done and historically been done and there are case law that allows it. Give me your take on the problem with uncertainty factors as you see it. Is it legal? Is it factual? What is it? I think I would characterize it as legal, your honor. And to elaborate, when you are, when you ask is it a scientific problem? Any scientific problem is, you ask a question and then some method gives you an answer in it. But it really depends which question you ask, and the statute is telling you which question to ask. What the uncertainty factors are doing is they're saying, here is the bleeding of edge of the most sensitive, like any hint of any effect, even like deleterious or not. And then to be absolutely on the safest possible side of that, I'm going to divide by an uncertainty factor. Whether that is scientifically valid for the question that has been answered in the IRIS system is not the point. It's not the question that Tosca directed them to answer. Well, doesn't Congress in 2605 itself say that EPA is supposed to be looking at, I don't know if it says the most vulnerable or whatever else, but they're supposed to protect those who would be most at risk. It seems to me the human studies or the results of the data you have from actual human exposure, it doesn't have present in it the kind of most vulnerable individuals that the uncertainty factors are supposed to take care of. Do I understand the problem correctly in your view, and you just disagree with how EPA addressed it? I think what you just described is not quite understanding it correctly. There is a separate section in the risk evaluation that addresses particularly vulnerable or susceptible populations. For example, children. Most workplaces do not have children at work these days. Certainly not the ones where methylene chloride is present. And what EPA did here, the uncertainty factors are going far beyond that and they're doing something different. It is, we find the most sensitive observation we can find, a hint of liver effect or a temporary decrease in peripheral vision. Then we find in that study the point at which the very earliest point, if you look at 100 people, where was the first of them that showed anything? We take that number and then we divide that by uncertainty factor. So it is protective factor times fight factor, times protective factor. And they're doing that in a part of the analysis that is quite separate from what they're doing for vulnerable populations. Does most vulnerable population, is that a factor of conditions of use? Absolutely. Which populations are particularly susceptible has got to depend on the condition of use. Council, could you give me some help about the, what would be the total market for this ethylene chloride? I'm sorry, I missed just one. The total market for the, excuse me, for the ethylene chloride. If I were looking at it from an economic perspective, what is the market in general? because I have some follow up questions. There's some markets to those. I don't have a number of the total market, but I'm going to, I think EPA's found that the rule would have an effect of about $40 million. I'm sorry? I think EPA found that the rule would have an effect of about $40 million, but that is, I'm not sure the actual market in terms of like dollar value of sales of the product, and there are definitely sub markets. Well, you're talking about the usage, and you're talking about the reasonableness of rules, regulation. It seems to be one of the dynamics here is what piece of the market is there? What is a reasonable regulation? It's not irrelevant to understand what the scope of the market is, and I'm trying to get a big picture of that. It's obviously, in many senses, a very high risk product. It's riskier than some things, less riskier than others, and I would point out, Your Honor, that- So is everything. True. There is an iris assessment for methanol that finds risk at lower concentrations than what EPA has set for methylene chloride. And that stuff's in your windshield wiper fluid. In your what? Windshield wiper fluid. Methanol? Methanol. Yeah. So, methylene chloride is extraordinarily useful. It's obviously not banned for consumer use, but this product, this chemical's basically already been banned for consumer use. That's right, exactly. Consumer use is not even the issue in this case. This is about commercial use against people who are trained and know what they're doing, and it is an extraordinarily useful substance. Just to give you one example, if you want to refinish an antiques product, you pretty much can't do it with anything else. Okay, you have time for rebuttal. We'll hear next from Mr. Thomas Katz. Thank you, your honors. May it please the court, I'm John Kelmas Katz for petitioner Sierra Club. I'd like to reserve three minutes, please. Well, good luck. We're running long, so. All parties in this case agree that the Toxic Substances Control Act requires EPA to eliminate methylene chloride's unreasonable risk. Our petition relates to the information that EPA must consider and the procedures it must follow to comply with that statutory mandate. Congress understood that EPA cannot eliminate unreasonable risk unless EPA first knows who is experiencing such risk and what specific risks they are facing. That is why, before regulating a chemical, TASCA requires EPA to begin with a comprehensive evaluation that determines the chemical's unreasonable risk. EPA violated TASCA in two ways here. It's unreasonable risk under conditions of use, to be more precise, right? That is exactly correct, your honor, and our arguments will address the conditions of use. So there are two violations of TASCA set forth in our briefs. First, despite finding high cancer risks to people who live around facilities that use and release methylene chloride, EPA neither determined whether those risks are unreasonable nor addressed them in the methylene chloride rule. And to address your honor's point, those risks were attributed to TASCA's conditions of use, to methylene chloride's conditions of use. Second, despite finding, or despite evidence that methylene chloride depletes the ozone layer, EPA never considered the risks of that ozone depletion, which includes skin cancer and cataracts and other serious harms. These failures- What does EPA say in its rulemaking or in its directives about what you're talking about? They don't have enough data yet or do they address it in some way? So your honor, is that specifically with respect to the ozone depletion or both issues? What you're talking about now, anything that you're saying that the EPA needs to have done that they didn't do? So let me start with ozone depletion, and then I'll address fenceline communities in terms of what EPA has said. EPA says in its rule that it wasn't required to consider ozone depletion. It changes track in its brief, and in its brief, EPA says that it did consider ozone depletion and found that methylene chloride does not deplete the ozone layer. That statement is not only wholly unsupported by the record, but it is contradicted by it. There is one principal study on methylene chloride's ozone depletion in the record. It is the Hossaini study at JA 1484 of the joint appendix. And that study finds that methylene chloride is ozone depleting. Moreover, EPA had information from comments submitted by the Environmental Investigation Agency. Those are at JA 692 of the joint appendix, which cited additional studies showing that methylene chloride can delay the recovery of the ozone layer by up to 30 years. In response, EPA does not cite any scientific evidence. It cites a stray statement from its alternatives assessment for methylene chloride, which just states methylene chloride does not deplete the ozone layer. That assessment cites a study that's not in the record. It is a 2002 study by the World Meteorological Association. And as we point out in our reply brief, the WMO, the World Meteorological Association, updates that study every several years. There have been five versions of the study published since 2002. The most recent versions confirm that methylene chloride depletes the ozone layer. And EPA ignores that. So here there is clear evidence of ozone depletion that EPA failed to consider. The same is true with respect to fence line community risks. EPA itself calculated serious cancer risks from methylene chloride's conditions of use to residents of fence line communities. The problem, Your Honor, is that EPA never determined whether those risks are unreasonable. And it does not address those risks in the methylene chloride rule. And that violates the statute, Your Honor. EPA cannot regulate methylene chloride to the extent necessary so that it no longer presents unreasonable risk, which is required by 15 USC 2605A. If EPA does not know whether the risks that it left unaddressed are unreasonable. EPA, sorry, I keep going. EPA claims that it didn't make that determination because its fence line assessment methodology was too unrefined. According to EPA, it was a screening level assessment that can't support conclusive unreasonable risk determinations. Even if the court were to accept that argument, it would merely mean that EPA had to go back, refine its fence line calculations, and make the determination that TSCA requires. The statute does not allow EPA to leave known risks unaddressed and uncharacterized and just hope for the best. So what would you do? So the remedy that we are asking this court for is a remand without vacature for EPA to address three specific things. First, we would like EPA to correct deficiencies in its assessment of fence line community risks. We identify those in our opening brief and our reply brief. Second, we would like EPA to consider the risks associated with methylene chloride's depletion of the ozone layer. And third, EPA must determine whether the risks to fence line communities and the risks from ozone depletion contribute to the chemical's unreasonable risk. If EPA makes that determination, then EPA is required to issue a rule that eliminates the unreasonable risk. But I want to be clear, your honor, we are not asking this court to tell EPA how to regulate methylene chloride. We are not asking this court to make its own determination of methylene chloride's unreasonable risks. We are merely asking for a remand for EPA to go back, conduct the analysis that TSCA requires, and to make the determination that TSCA requires. Do you bear any burden to say, explain why the regulation as it stands before us is insufficient? Yes, your honor. I think the record supports that. Because it's a very, very, very stringent regulation. Yeah. So I don't under, I mean, at some point you, it seems to me you're asking EPA either to redo what they've already done, or just to, or somehow to ratchet down below two parts per million? I mean, what do you mean? So your honor, the two part per million standard applies to occupational exposures, which is- Well, I understand that. And by definition, the people in the fence line communities are going to be exposed to a lot less. They often- Most of this is inhalation danger. So let me go back to your first question, which is what in the record supports this claim? And I think it really is EPA's own analysis. EPA initially excluded fence line communities totally from its risk evaluation. EPA then recognized that was improper and contrary to the statute. So it went back and conducted an assessment of fence line community risks. What EPA found was that methylene chloride presents risks to fence line communities that exceed EPA's own selected benchmark or threshold for further action. Now, above that benchmark, EPA isn't necessarily required to say that all risks are unreasonable, but it is required under its own guidance to either further assess those risks or to address them. And here EPA did not do that. And EPA claims that its rule does enough. What EPA has said is that its regulation of methylene chloride largely addresses risks to fence line communities. I want to be clear about what that means. What EPA means there is that EPA's regulation of methylene chloride's risks to workers and consumers will have some collateral effects on fence line communities. We agree with that. We agree that where EPA has prohibited a condition of use to address occupational risks, the people who live around the facilities that were previously engaged in that condition of use, they're no longer exposed. They're no longer at risk. We'll give you that. The question is, what about the other communities? What about the communities surrounding facilities that continue to use and release methylene chloride? EPA calculated their risks. It found risks above its benchmark, and it did nothing. And the statute does not permit that, Your Honor. Now, I would like to briefly address EPA's challenge to our standing on ozone depletion. Before you get to that, let me ask you, there are 10 chemicals listed, with MC being one of them, that EPA was required by Congress to examine for regulation. How many of those had been under the jurisdiction of OSHA already? So, if I understand Your Honor's question, it's how many— Well, methylene chloride is in a list in 2605A, I guess it is, or at least refers to it. And OSHA is supposed to at least be regulating methylene chloride. Yes. So I'm asking, of the other nine, would those all fall under the jurisdiction of OSHA, and Congress decided EPA needed to be looking at them also? Most of them do, Your Honor. Most of the chemicals that EPA is regulating under TSCA, or at least evaluating under TSCA, do have an OSHA-permissible exposure limit. I want to make two points about that. First is, when Congress amended TSCA in 2016, Congress understood that these OSHA regulations were on the books, and Congress still required EPA to specifically address risks to workers. Workers are named in the definition of potentially exposed and susceptible subpopulations. So this is something Congress regulated, or Congress legislated, over the backdrop of OSHA regulations, and it still said, under TSCA, EPA needs to look at those risks. With respect to methylene chloride specifically, my colleague was correct. The OSHA standard is 25 parts per million over a workday. EPA found risks significantly below that level, Your Honor, and OSHA does not require any action below that level. So EPA found risks in its risk evaluation that are not addressed by OSHA. But again, this goes a little bit beyond kind of the issues that we've addressed in our brief. Please go on to standing. Thank you, Your Honor. Now, Sierra Club's really filing. I mean, you have two different parties of interest here, right? You have the fenceline communities on the one hand, and I will assume that Sierra Club somehow has standing to represent fenceline communities. But ozone is another matter. That's correct, Your Honor. And ozone is the one claim on which our standing was challenged. So would you like me to focus on that?  Certainly. Sierra Club has standing to challenge EPA's failure to consider and address methylene chloride's depletion of the ozone layer because Sierra Club has members who experience concrete and particularized harm because of that failure. These harms are not conjectural or speculative, as asserted by EPA. There is a chain of causation, but every link in that chain is supported by the facts and science in the record, beginning with the fact that there are currently significant ongoing releases of methylene chloride. More than a million pounds are released per year.  Across the country, Your Honor. I don't have all the kind of locations, but there are. And that fact alone actually distinguishes this from every standing case that is cited in EPA's brief. We're not talking about hypothetical releases from a facility that is yet to be constructed, like there was in Shrimper's, or the possibility of surveillance that depends upon multiple third-party actions that may or may not ever occur, which is what the Supreme Court addressed in Clapper. Here you have known ongoing releases of methylene chloride. Second, as I noted previously, the evidence supports that methylene chloride depletes the ozone layer. That's supported by studies in the record, such as the Hosseini study. Third, the depletion of the ozone layer allows more ultraviolet radiation to reach the Earth's surface. All the recent evidence was suggesting that the ozone layer is building up. It is recovering, Your Honor, because other chemicals are being phased down. So the phase-down of CFCs and HFCs— Well, now you say that because of. We don't know that it's because of. There is evidence in the record, Your Honor, actually it's referenced in the Energy—or sorry, Environmental Investigation Agency comments, which are at JA 692. Again, what the studies there found is the ozone layer is recovering. I believe that kind of the studies do discuss the reasons for that, or the comments do discuss the reasons for that. And there is evidence that methylene chloride can delay the recovery of the ozone layer by 30 years. So even though it is recovering, this chemical is allowing more ultraviolet radiation to the Earth's surface. That ultraviolet radiation is causing harm. And I know that I'm over my time. I'll wrap up quickly. We recognize this is a global problem, Your Honor, and that many people are exposed. Not all people are harmed equally by methylene chloride's depletion of the ozone layer. You mean only members of the Sierra Club? People who live at high elevations and who spend significant time outdoors have greater exposure to ultraviolet radiation and therefore experience greater harm from the depletion of the ozone layer. We've submitted a declaration from Frank Lilly, who's a Sierra Club member in Silverthorne, Colorado. He lives at 8,700 feet above sea level up in the Rockies. He spends his days hiking, kayaking, biking, and engaged in outdoor recreation. For purpose of comparison, this courthouse that we're all in is approximately four feet above sea level. Mr. Lilly is going to experience more harm from methylene chloride's depletion of the ozone layer than just about anybody in this room, solely by virtue of where he lives and how he spends his days. Okay. Thank you, Your Honor. All right. You have a chance for rebuttal. Ms. Brown. Good morning. May it please the Court. Laura Brown on behalf of EPA. I will be addressing industry's arguments, and my colleague Sam Stratton will be addressing Sierra Club's arguments. I'm sorry. What's the division? I'm sorry. I'm from the Department of Justice, but I'm here on behalf of EPA.  That's what I just wanted to restate. Industry arguments. I will be addressing Sierra Club for your colleague. My colleague Sam Stratton will be addressing Sierra Club's arguments, so we're going to go back a little bit. Also with us today is Daniel DePasquale from EPA's Office of General Counsel. EPA has now determined on two separate occasions that methylene chloride presents an unreasonable risk to human health. The first time in 2020, under the Trump administration, when it determined that 47 conditions of use, even assuming PPE use, present an unreasonable risk to human health. And again in 2022, when the Biden administration revised that unreasonable risk determination and found that the whole chemical presents an unreasonable risk. EPA's unreasonable risk determination, extending across two administrations, is supported by the best available science and the weight of the scientific evidence, and it should be upheld. Now EPA is reconsidering two issues that relate to how it conducts risk evaluations. Because EPA is reconsidering those issues, I am unable to present the agency's position on them, but is also not confessing error on them. However, those two issues are not fundamental to the court's review of this rule, and I'll explain why. Well, he already said they only apply to six of the conditions. That's correct. Well, so you can't be defending those six conditions, correct? Well, Your Honor, we believe that the issue is still before the court. However, if the court agrees with industry petitioner's view, it is our position that yes, those, it's actually, so there are six conditions of use that in 2020, when EPA assumed PPE use, it found did not present an unreasonable risk. When EPA revised that risk determination, it found that five out of the six did not. So it's actually five conditions of use that would fall out of regulation. And EPA explained in the rule that it designed the rule to be severable. So those five conditions of use could be severed from the rule. But the majority of the rule, the 47 conditions of use that EPA found- But you're still retaining the right to regulate on the basis of an assumption that there's no PPE and an assumption that it's the whole chemical instead of condition of use, which is the statutory term. Is that correct? Well, that's not within the regulation. So within the regulation, the regulation bans chemicals and restricts chemical use based on conditions of use, not on the whole chemical. So even if the court were to find that EPA was required to make risk determinations based on conditions of use rather than the whole chemical, it actually doesn't affect the rule itself, the substance of the rule. And it really would amount only to harmless error. Well, in 2020, as I understand it, all there was was a determination of unreasonable risk. But it was not based on this two parts per million and whatever was the eight-hour exposure, correct, or the short-term exposure, correct? Right. So the 2020 unreasonable risk determination is separate from the rule regulating.  But what I would say is the science. So the risk evaluation is the science. It's EPA's analysis of what are the hazards? What are the exposures? It then characterizes the risk. And that's where EPA basically came up with a- they identified a point of departure and came up with margins of exposure. That's in 2020 they did this. They didn't change any of the underlying scientific analysis. In fact, the ECCL, the two parts per million, and the STEL, 16 parts per million, are based on the margins of exposure that were developed in 2020. So the underlying risk evaluation- Yes, but there are a lot of factors that go into the final determinations of the rule, correct? And all those, you may say you were relying on the data from 2020, but those conclusions were not drawn in 2020. Well, I would say the underlying math was the same. And so if you're looking at the way you develop a exposure limit, and this is well established within toxicology, is you find a study that has a level that causes an adverse effect. And that's what we call the point of departure. And then you take that and you divide that by exposure doses. And that is this margin of exposure. And that was done in 2020. And EPA used that same number. They just divided it by the uncertainties, which are standard, quantified, often frequently used. This is not something that EPA just came up with. And that's how you get the ECCL. It's all using the same math that was in the 2020 risk evaluation, but it's now requiring that that be the exposure limit for the conditions of use where it's not banned, basically, where they can continue to use. So I would submit that the 2020 risk evaluation is fundamental to the actual rule because the analysis, the analysis of the hazards, the analysis of the exposure data all derives from it. Nothing was changed. In all honesty, what is the likelihood that a prior administration would have essentially banned methylene chloride? The rule has not been rescinded and it's not being re-evaluated. But the rule that exists today says that any party that sells one iota of methylene chloride to a consumer is automatically in violation, correct? That's correct. And I don't think anyone here would dispute that methylene chloride presents an unreasonable risk to consumers. But I mean, it's hard to say that any party can verify that they have never given a bit of methylene chloride to their friend who's refinishing old furniture, a subject on which I'm particularly sensitive because I've done it and I survived. I'm glad you did, Your Honor. I think what I would say is EPA understood, for instance, on the point of refinishing furniture. EPA heard comment from the regulated community and determined that there wasn't currently existing an appropriate replacement for that. So it is a continuing bill to allow that use to continue, now subject to worker protection for another five years so that can be developed. So this is not a case where EPA was just unilaterally deciding we don't like this chemical. We are going to regulate so there is zero risk. It took into consideration science and the facts. And this record is voluminous. It is a substantial record. It's technical. As an attorney who has not studied toxicology, it took me a long time to go through and understand it. But EPA has supported its decisions based on the science and based on comments from the regulated community. Counselor, you talk about the science and that's in a way what this whole case is about, but it's how the science interacts with the law that we need to apply. The opposing counsel, not both opposing counsel, the industry, petitioners have studies that come from the actual use of methylene chloride that shows much higher exposure numbers before there is any risk of any harm. And the dramatic effect, the math that gets dramatic when you start applying these uncertainty factors. We start multiplying things together, the size 10, things change quickly. So what is the reason? How can it be that actual on the ground, in the factory, whatever numbers are so much different than the numbers that now have been imposed by EPA? Sorry, and I think I understand your question, but just to clarify, so there were at least three human epidemiological studies that were identified by EPA and by industry petitioners where employees were exposed to, and I think the highest amount was 495 parts per million, which yes, is much higher than two parts per million. Now in those studies, those are epidemiological studies, meaning they're observational studies, there's not a, we can only know what parameters were tested by the study's authors. EPA can't conduct human tests, so it's limited to the evidence that it's available. And in those studies, two out of the three, not all three, two out of the three, the workers had increased levels of bilirubin. And that- And what, does bilirubin correlate directly with liver damage? It doesn't always, but it suggests that there might be liver damage. Now EPA can't ignore, be here challenging a different question of EPA, just completely ignore those studies. It didn't ignore them, it acknowledged that there were three human epidemiological studies, two of them suggest that there may be an adverse effect. But on the other side, EPA found at least, I think it's seven, animal studies where animals, including, it was rats, dogs, across species, when chronically exposed to methane chloride developed adverse liver effects, the precursors or actual fatty liver disease. EPA cannot ignore those studies, and those studies are highly rated, and they also can dissect the animal after, and identify this liver damage. Liver damage in humans is a little different. It's hard, we can't dissect a human, obviously, and it's harder to tell based on blood serum tests, especially at the early stages of liver disease. And I would direct the court to JA 525 and 526, and that's where EPA gets into some of the details about the limitations of the human studies. And because those human studies are limited, that's why the court then, excuse me, the EPA has to work backwards, and it has to think, well, there are standardized uncertainty factors. Because we don't know, humans are different. Someone who has asthma, someone who has heart disease, someone who has a genetic disposition to process methylene chloride differently, may be much more sensitive to it. And EPA has the statute. At what level are you determining vulnerable populations? Are you going to, is this like endangered species, where we continually define species down onto the molecular level? Are you going to say a vulnerable population is theoretically dependent on genetic testing? No, I don't think that, Your Honor. I think Congress has set forth some explanation. But as Mr. Bradley suggested, though, doesn't vulnerable population have something to do with the conditions of use? All of which now are industrial use? Almost all. Well, EPA considered consumer use here, too, and it is banning consumer use for almost all conditions of use. But for consumers. Well, they banned it all in the use of paints and paint products, right? That's correct, yes. Yes. Well, no. Did they use the 2020 study for that also, or not? I think it was actually in 2017. So Congress and EPA have been worried about methane chloride for many, many years. And even before the 2016 TSCA amendments, EPA was already conducting a risk assessment, a little different from the risk evaluation directed by Congress here. OSHA's been concerned about it for at least 40 years, right? That's correct, Your Honor. And OSHA makes requirements for PPE, right? EPA does, excuse me, OSHA does require PPE. I think the distinction here, and my colleague from Sierra Club did explain this a bit, and I can provide a little further context, is that TSCA, in amending TSCA, Congress directed EPA to consider workers, despite the fact that OSHA also considers workers. And EPA did consider the OSHA regs and why it determined that it should not refer this matter to OSHA, because it found, and OSHA concedes, that even with 25 parts per million, there's still a substantial risk to workers. And I will also note the 25 part per million is based on a cancer finding. It's not based on what EPA determined, in which its scientific advisory committee agreed, the most sensitive, or the most common adverse effect is liver, is liver, adverse liver effects. But at some level, don't you have to connect, all you've got is higher bilirubin in humans. You don't have liver disease in humans. You have temporary effects from the, very temporary effects on peripheral vision and such. At some point, if you're going to really show that there's toxicity to the liver, it seems to me you have to show toxicity to the liver. And that requires epidemiological testing, doesn't it? Well, I would say EPA is limited in the type of human studies it can conduct. Well, I'm sorry, I don't see that EPA is tasked with finding unreasonable risk. And unreasonable risk from a scientific standpoint, when you're talking about humans, is epidemiology, isn't it? Well, EPA would certainly agree that epidemiology is the first, that's the first place you look. Or human studies, I should say, are the first place you look. But when you don't have concrete information, they need to, they have to look towards animal studies. What I'm saying is not new. Back in 1982, I believe, this court had a case, 1983, Gulf South Insulation versus Consumer Product Safety Commission, which was, involved the regulation of formaldehyde, if I'm not mistaken. And a panel of this court really didn't think much of rat studies back then. Well, Your Honor, I think what I would, Tosca or Congress... It was also under the same legal standard, which was substantial evidence. And by the way, we noticed that EPA's brief didn't cite a single case that relied on the substantial evidence standard, as opposed to the lower arbitrary and capricious standard. Well, we don't dispute the substantial evidence. Well, you didn't cite any. Okay, yes. Well, we do, I will submit now, we do not disagree that substantial evidence is the standard here. But what I would submit to the court is to observe the actual weight of the evidence, which the substantial evidence essentially is. And although the court might have some misgivings about the rat studies, it's EPA Scientific Advisory Committee, it's Independent Scientific Advisory Committee, agreed with EPA's decisions to use the rat studies and agreed that the weight of the evidence supported that there were adverse effects as a result of chronic exposure to methane chloride. I'll just conclude with one sentence that Judge Charles Clark wrote, to make precise estimates, precise data are required. And that was the grovelment of the review of the evidence that that panel considered. So Mr. Brown, before you sit down, you made a... You were talking about the studies that are available on humans and those that are not. It seems to me, we had this exchange a little bit earlier, I suppose. But you're saying, in your view, that it is accepted scientifically to use the uncertainty factors to deal with the absence of more appropriate evidence. What is your best support? It's not a legal position so much as a scientific position. What is your best support in the case law that that is appropriate, to be relying on certainty factors in the way that the EPA did in this case? Well, I don't think I have a specific case I can... Did the Second Circuit at all in dealing with consumer use of this chemical rely on those? They did not look at the uncertainty factors, Your Honor. But what I would, I would point this court to corrosion-proof fittings. EPA is entitled to some deference or to deference on its fact-finding... I'm sorry, corrosion-proof fittings. Okay, I'm just not hearing. So, thank you. It's blurry. It's blurry, yes. In that case, the court agreed that EPA is entitled to deference on areas that are based on its scientific expertise. And certainly, the use of exposure factors is not outside of EPA's expertise. It's well within it. And those factors, just to assure the court, they are widely recognized and widely used in toxicology. They're wildly, widely important in this case because you can't get to where you want to be without them. I agree, Your Honor. Fair statement? Fair statement. All right. Any other questions, Your Honor? Not now, thank you. Thank you. Good morning, and may it please the Court. Sam Stratton for Respondents. The Court should deny Sierra Club's petition for review. Sierra Club raises two overarching challenges to the rule. First, that EPA failed adequately to address the risk to certain vulnerable subpopulations. And second, that EPA failed to consider risk to atmospheric ozone. Both arguments fail. First, EPA properly addressed the risk that methylene chloride poses to vulnerable subpopulations, as is required by TSCA. Sierra Club principally challenges EPA's failure to formally determine whether methylene chloride poses an unreasonable risk to fenceline communities, which means communities who live near facilities that use methylene chloride. But TSCA did not require EPA to determine whether methylene chloride poses an unreasonable risk to fenceline communities. TSCA instructs EPA to conduct risk evaluations to determine whether a chemical substance presents an unreasonable risk, including an unreasonable risk of potentially exposed or susceptible subpopulations identified by EPA. But EPA did not identify fenceline communities as a relevant vulnerable subpopulation when it conducted the risk evaluation for methylene chloride. TSCA, therefore, did not obligate EPA to determine whether methylene chloride poses an unreasonable risk to fenceline communities. To be sure, EPA subsequently identified fenceline communities as a vulnerable subpopulation. And just to correct the record on this point, EPA did not, at any point, concede that its failure to previously identify fenceline communities was contrary to the statute. EPA simply made a policy determination that it would, going forward, consider fenceline communities as a vulnerable subpopulation. Having made that determination, EPA was still not obligated to formally determine whether methylene chloride poses an unreasonable risk to fenceline communities. Nothing in TSCA requires EPA to reopen a completed risk evaluation, simply because it has identified a newly relevant vulnerable subpopulation. Still, EPA took steps to ensure that the rule protected fenceline communities, while also complying with TSCA's directive to expeditiously address risks from toxic substances. EPA's analysis was thorough and scientifically sound. EPA designed a screening-level approach to evaluate risk to fenceline communities, presented the proposed approach to the Science Advisory Committee on Chemicals, and tailored the approach in response to the committee's comments. EPA's ensuing analysis showed no risk to fenceline communities from water exposure, and showed that the rule would eliminate the overwhelming majority of risk to fenceline communities from ambient air exposure. Specifically, EPA found that only three facilities showed potentially risky concentrations at 100 meters from the facility. Of those facilities, one is not adjacent to any fenceline communities, and, moreover, represents a condition of use that EPA anticipates will decline under the rule. The other two facilities represent a condition of use that EPA expects to remain static under the rule, but whose emissions are heavily regulated under the Clean Air Act, making it highly unlikely that methylene chloride near those facilities will increase. Based on that analysis, EPA determined that the rule effectively managed methylene chloride's risk to fenceline communities, and so complied with TSCA. How does EPA regulate methylene chloride under the Clean Air Act? There's a NESHAP, National Emission Standard for Hazardous Air Pollutants for Methylene Chloride. So what does that require? That's not in the record here, Your Honor, specifically, but the NESHAP does limit facilities' ability to emit methylene chloride directly into the atmosphere, which therefore— Well, what does that mean? I mean, I don't know as much about manufacturing facilities as I'd like. Does that mean basically that when you have methylene chloride, you buy it in a sealed container, you put it into another sealed container? Where would it be emitting into the air? Do you have any idea? If there's a facility that's using— Methylene chloride, of course, is highly volatile, right? And often the risk is from inhalation. And so if it's being used in a facility, it might escape somehow. So there are concerns about both fugitive emissions escaping from a facility and sort of direct emissions that you might imagine from a fence pipe. But just to go back to the argument, so EPA's decision to proceed with the screening level analysis, just to clarify, was consistent with TSCA, and moreover, it was prudent. As discussed, of course, TSCA doesn't require EPA to reopen a completed risk evaluation. By contrast, TSCA does afford EPA authority and discretion to decide how to manage risk when it is proposing a risk management rule. And TSCA instructs EPA to expeditiously address risks from toxic substances. In light of that statutory directive, the urgent need to regulate methylene chloride and EPA's determination that the rule would address substantially all risk defense line communities, even under the conservative assumptions of EPA's screening level analysis, EPA made the reasonable determination to address methylene chloride exposure in fence line communities now through the risk management rule rather than reopen the risk evaluation. Sierra Club likewise is wrong to argue that EPA violated TSCA in declining to consider aggregate risk from cumulative exposure pathways. TSCA's plain text authorizes but does not require EPA to consider aggregate risk when proposing a risk management rule. EPA reasonably declined to consider aggregate risk when crafting this rule, given the evolving science on cumulative exposures to methylene chloride and, again, the urgent need to regulate methylene. If the risk to fence line communities comes from fugitive emissions, which EPA, didn't EPA say in this regulation that they were not going to consider that kind of emission because of the, because of the Clean Air Act regulations? Yeah, so sorry if I misspoke earlier. Just, the risk comes from both fugitive emissions and more traditional, you know, stack emissions, intentional emissions. So just. Yeah, but EPA regulates all of, under the Clean Air Act, they regulate. So how does Sierra Club have a justification for coming in on this regulation at all, vis-a-vis fence line communities? So EPA. Because this regulation does not cover ambient air emissions. So when EPA initially promulgated the risk evaluation, at that point in time, EPA considered fence line communities to be out of scope for exactly the reason that your honor is identifying, because the existing NESHAP under the Clean Air Act protects against those sorts of emissions. In between that time and when EPA issued the risk management rule, EPA changed its view on what the statute requires specifically vis-a-vis other statutes. And so EPA did consider risks to fence line communities of the sort that you're identifying to be within the scope of the rule. And that's why it chose to conduct the screening level analysis for fence line communities. Well, still, I don't see how they, how EPA could. All right. Because all they want is to correct deficiencies. And identify a contribution to unreasonable risk. That doesn't necessarily mean a change in regulation under this statute. And that's exactly right, your honor. EPA might or might not change the protections, because the rule already is very protective of fence line communities, as EPA identified in its screening level analysis. Again, EPA identified that of about 250 methylene chloride facilities, only 14 showed potentially risky concentrations at 100 meters from the facility. And again, that's based on a conservative assumption of a one in a million cancer risk, which is about 100 times more conservative than the one in 10,000 cancer risk that EPA applied as a benchmark for most of the risk evaluation. So using this, again, intentionally conservative approach, EPA identified a vanishingly small number of facilities, determined that most of those facilities would cease using methylene chloride under the rule. And identified only two facilities where there would be potentially the same level of methylene chloride use under the rule as there had been before. And so, you know, looking to that conservative data, EPA decided that the rule that it was already considering was sufficiently protective. And so even if there was any error, which there wasn't, it was at best harmless. So to proceed to another one of Sierra Club's arguments, EPA also adequately addressed potential risk to people whose genetic makeup makes them more likely than average to develop cancer from exposure to methylene chloride. EPA extensively analyzed the role of genetics in determining an individual's risk of developing cancer from methylene chloride exposure. And it determined that the existing calculations for the inhalation unit risk adequately capture that subpopulation within the data for the whole population. That decision was reasonable, given that EPA relied on conservative estimates designed to capture a broad sweep of data, and that the subpopulation at issue accounts for approximately a third of all humans. Nor, contrary to Sierra Club's argument, does TSCA require EPA to conduct separate risk evaluations for vulnerable subpopulations. So the rule complies with TSCA's directive that EPA protect against unreasonable risk to vulnerable subpopulations, and the court should reject Sierra Club's first argument. Turning to the ozone argument, the court shouldn't even reach that argument, because as was discussed earlier, Sierra Club lacks standing to raise it. Sierra Club's argument is the classic quintessential increased risk argument that this court routinely rejects and finds inadequate to support standing. And contrary to Sierra Club's assertion on reply, the court has been clear that the increased risk claims often fail to satisfy the actual or eminent requirement of standing, even when they allege a particularized harm, as admittedly Sierra Club does here. So that was what the court said in Trimper's. And likewise here, Sierra Club alleges only a series of cascading potentialities that may or may not result in an injury, and therefore insufficient to support Article III standing under this court's precedence. In any event, the prevailing science suggests that methylene chloride is not an ozone-depleting substance, because as a highly volatile chemical, methylene chloride does not survive in the atmosphere for long enough to damage ozone. EPA made that finding based on a thorough review of the science, and has consistently reiterated it for 30 years, including in the record. In response, Sierra Club offers a single contrary article that provides no new data and simply rehashes existing data based on a novel assumption that methylene chloride survives for longer in the atmosphere than scientists have long believed. So even if the court reaches Sierra Club's ozone arguments on the merits, which it should not given Sierra Club's lack of standing, it should reject Sierra Club's challenge and uphold the rule. If there are no further questions, I'll yield the rest of my time. Thank you. Thank you, Your Honor. All right, Mr. Bradley, rebuttal. Thank you. I just have a couple of topics, a few topics to talk about. First, Your Honor, you're right to focus on Gulf South, but I also want to point out that EPA's own documents say that human epidemiology is the preference. And so we cite those on the reply brief at pages 21 to 22, so you can find that. Regarding bilirubin and liver effects or not liver effects, the Soden study carefully chose measurements that were designed to be the most sensitive they could think of to liver harm. That's discussed. They're not really. Is this a carcinogen? I believe that OSHA found it a carcinogen at very high levels, yes. Okay. Yeah. It wasn't clear to me because it seemed to me that all of these studies were designed to show elevated bilirubin, which is not necessarily an indication of actual disease. I agree with you, Your Honor. It's cancer. That's right. But my point about the Soden study is they are actually not just bilirubin. They were looking for trying to find other chemicals, measurements that would be the most sensitive to actual damage and saw no liver effects. It's not just bilirubin. Right. That's in the reply brief on page 27. Really, hundreds of thousands of workers have been exposed for years and years and monitored without showing harm below the OSHA levels. Regarding the five conditions, one thing I wanted to clarify is that if you agree with us about those five conditions, you should not just vacate the rule from last June, but also the 2022 risk determination, which under the statute, that's a final action as well that sprang into being as a final action when the 2024 rule was published. In addition, if you agree with us about the 47 and the rest of it, there is also the 2020 risk evaluation that should also be vacated alongside the final rule. So I just wanted to be clear about the relief. Okay. And then one last thing, Judge Southwick, we were talking about where do these things show up in the brief. So I went back to look at the record. I went back to look at it. And I agree with you that appreciable, the notion that they're looking for appreciable risk first shows up in EPA's brief that is purely post hoc. With respect to the IRIS, there are a bunch of documents that are components of that framework that do appear in the record. If you look at the EPA's brief at about page 47, they cite a couple of these from the record, but then it's only in their actual brief that they tie it together and say openly, this is what we were doing, the IRIS framework. So is that post hoc reasoning in your view? Okay. Is that all you have to say? Yes. Does that mean that you're abandoning the substantial portion of the brief that had to do with the alternative uses and the technically and economically feasible alternatives? Certainly not, Your Honor. I just was focused on these topics because time is brief, but we certainly still believe those things and maintain them. All right. Thank you. Okay. Mr. Kalmus Katz. Your Honor, I'd like to begin with the statutory standard. TSCA requires EPA to regulate methylene chloride to the extent necessary so that it no longer presents unreasonable risk. Here, EPA admits that it identified risk to fence line communities. It admits that it has not determined whether those risks are unreasonable. That's at JA31 of the joint appendix in the final rule. And it admits that it is leaving communities exposed to those elevated cancer risks. That violates the statute. EPA provides two justifications. One, it says that, well, it didn't consider these risks when it first evaluated methylene chloride. That is not a defense of the methylene chloride rule. That is a condemnation of the risk evaluation. It is acknowledging that EPA failed to consider risks that EPA now says are associated with the chemical's conditions of use. That violates 15 USC 2605B4. Second, EPA says once again that it has done enough, that it is addressing certain risks to certain communities, and only a few communities are going to be left exposed. Well, if the presupposition for the regulation is evaluating unreasonable risk under conditions of use, so your people, the fence line communities, are not using it. Your Honor, the fence line communities are exposed from the same conditions of use that EPA assessed in the risk evaluation. What do you say about his comment that only they found 14 communities where at 100 meters there was any appreciable exposure whatsoever? I don't think that is what EPA found, Your Honor. EPA found that there were 14 communities where the risks at 100 meters exceeded the benchmark that EPA had set, exceeded the one in a million cancer risk benchmark. One in a million is pretty low. It is the benchmark that EPA set in its fence line assessment methodology, Your Honor. That is at JA 1245 of the joint appendix. The issue here is not that EPA necessarily was required to call this unreasonable, not call this unreasonable. The first error here is EPA never made the determination that TSCA requires. EPA found these risks. It didn't know, and it says that it didn't know whether they were unreasonable, and it left them unaddressed. That is not permitted under TSCA, Your Honor. Unreasonable risk is a yes or no proposition. EPA cannot answer with a shrug. Under, you know, under, what's the best scientific support for saying a one in a million risk of anything is an unreasonable risk? It is a widely used benchmark, Your Honor. It is the benchmark that EPA selected here at JA 1245, and it is the benchmark. I'm not sure whether they selected it or not. One in a million is pretty darn small. It is the risk threshold. EPA brought this question to its— Where's the science? That supports one in a million risk of anything being unreasonable. The Science Advisory Committee on Chemicals addressed this specific issue, Your Honor. And that brings up another thing. I did know, we did a little bit of looking at that, and it looked like some of those members of the Science Advisory Committee had also themselves received EPA grants. And here at ClubsView, does that create a potential conflict of interest? It does not, Your Honor. If you look at the full composition of the Scientific Advisory Committee, many members have also been funded by the American Chemistry Council and companies that manufacture methylene chloride. I think EPA aims for a diverse range of views on the SAC. And what the SAC said, the EPA brought this issue to its science advisors, and the SAC said this benchmark is appropriate. Well, you can get a bunch of PhDs together, and as William F. Buckley said, who would you rather have govern you, the Harvard faculty or 10 people from the phone book? Your Honor, I believe the SAC is chaired by a professor from Baylor University. I'm not, I'm saying PhDs. Thank you, Your Honor. Thank you. I appreciate that. All right. Next case of the morning.